**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JOHN A. BREDA, M.D.,                         )
253 Greendale Ave.                            )
Needham, MA 02494                             )
                                              )
              *Plaintiff*                     )
                                              )
v.                                            )          Civil Action No.
                                              )
UNITED STATES OF AMERICA                      )
c/o United States Attorney's Office           )
for the District of Columbia                  )
555 4th St., N.W.                             )
Washington, D.C. 20530,                       )
                                              )
UNITED STATES DEPARTMENT                      )
OF HEALTH AND HUMAN SERVICES                  )
200 Independence Ave., S.W.                   )
Washington, D.C. 20201,                       )
                                              )
ALEX AZAR, in his official capacity as        )
Secretary for the United States Department    )
Of Health and Human Services                  )
200 Independence Ave., S.W.                   )
Washington, D.C. 20201,                       )
                                              )
NATIONAL PRACTITIONER DATA BANK               )
*An entity of and run by the U.S. Dept. of*   )
     *Health and Human Services*              )
4094 Majestic Lane, PMB 332                   )
Fairfax, VA 22033,                            )
                                              )
              *Defendants*.                   )
                                              )

---

**COMPLAINT AND DEMAND FOR JURY TRIAL**

1.      Plaintiff John A. Breda, M.D. ("Dr. Breda"), through undersigned counsel, seeks

declaratory relief and preliminary and permanent injunctive relief against Defendants: United

States of America; United States Department of Health and Human Services; Alex Azar in his

official capacity as Secretary of the United States Department of Health and Human Services; and the National Practitioner Data Bank.  A Writ of Mandamus is also sought against the same parties for the same relief.

2.     Dr. Breda seeks review of the Defendants' decision to maintain and continue disseminating a report that contains inaccurate and derogatory information about him.  Dr. Breda requested Secretarial Review and was denied relief in 2015.  He sought reconsideration and was again denied relief in 2017.

3.     Dr. Breda's complete Request for Reconsideration, including its accompanying sub-exhibits, is attached in whole as **Exhibit A**.  For ease of reference, the seventeen (17) sub-exhibits to the Request for Reconsideration are attached, individually, as **Exhibit A-1** through **Exhibit A-17**.  The Secretary's denial of Dr. Breda's Request for Reconsideration is attached as **Exhibit B**.

## JURISDICTION AND VENUE

4.     Jurisdiction in this Court is based on 5 U.S.C. § 701, *et. seq.*, the Administrative Procedure Act (the "APA") and 28 U.S.C. § 1331.  The Complaint seeks review of a final United States agency action taken under the Health Care Quality Improvement Act of 1986, 42 U.S.C. 11101, *et seq*. ("the HCQIA") for which there is no other adequate remedy.

5.     Venue is appropriate in the District of Columbia pursuant to 28 U.S.C. § 1391(e)(1)(B).

## PARTIES

6.     Dr. Breda is a medical doctor and U.S. citizen residing in Needham, Massachusetts.  He is an internal medicine specialist (internist).

7.     Defendant United States of America is named pursuant to 5 U.S.C. § 702. Defendant United States Department of Health and Human Services ("HHS") is a cabinet-level agency of the United States government which is responsible for administering and maintaining the National Practitioner Data Bank, wherein derogatory information regarding medical practitioners is listed and disseminated in response to queries from hospitals and other qualified entities.

8.     Defendant Alex Azar (the "Secretary") is the Secretary of HHS.  This action is against the Secretary in his official capacity.

9.     Defendant National Practitioner Data Bank (the "NPDB") is an entity of, administered and operated by HHS.  It has offices in Fairfax, Virginia, wherefrom information purportedly as to physicians' competence and conduct is received, maintained, and disseminated in response to queries from hospitals and other statutorily authorized entities.

## FACTS

### The National Practitioner Data Bank (NPDB)

10.     The NPDB was created by the Health Care Quality Improvement Act of 1986, 42 U.S.C. § 11101, *et seq.*, (the "HCQIA"), premised upon the following findings by Congress:

(A)     The increasing occurrence of medical malpractice and the need to improve the quality of medical care have become nationwide problems that warrant greater efforts than those that can be undertaken by any individual State.

(B)     There is a national need to restrict the ability of incompetent physicians to move from State to State without disclosure or discovery of the physician's previous damaging or incompetent performance.

(C)     This nationwide problem can be remedied through effective professional peer review.

11.     The HCQIA authorized HHS to create the NPDB, 42 U.S.C. § 11134, mandating reporting requirements which are directly at issue here.

12.     42 U.S.C. § 11133(a)(1)(B) requires healthcare entities to file an adverse action report ("AAR") against a physician when such a healthcare entity accepts the surrender of clinical privileges while the physician is under investigation by the healthcare entity relating to possible professional incompetence or misconduct, or in return for not conducting such an investigation.

13.     For reporting purposes:

    a.  an "investigation" is a formal, targeted process;

    b.  an individual supervisor is not "the healthcare entity"; and

    c.  a "surrender of clinical privileges" is distinct from a resignation of employment; depending on the circumstances, a resignation of employment may or may not also entail a surrender of clinical privileges.

14.     Pursuant to 42 U.S.C. § 11136, the Secretary must provide for disclosure of information reported pursuant to the statute to the physician at issue and must also provide a procedure where the accuracy of the information is disputed.  The regulation implementing 42 U.S.C. § 11136 appears at 45 C.F.R. § 60.21.  Section 60.21 provides instructions for the subject of the AAR to dispute the accuracy of an AAR with both the reporting entity, and, if discussions with the reporting entity fail to resolve the dispute, to request Secretarial review of the AAR.

15.     The NPDB also issues a guidebook that is updated every few years.  The April 2015 version was in effect when the events underlying this matter, including the administrative

proceedings, took place (the "Guidebook"). The Guidebook states that, for reporting purposes, an "investigation" is "a formal, targeted process [that] is used when issues related to a specific practitioner's professional competence or conduct are identified...." Guidebook at § E-34 (emphases omitted).

### Plaintiff's Background

16.     Dr. Breda completed bachelor's and master's degrees at the New England Conservatory of Music in Boston, Massachusetts. Dr. Breda completed his M.D. in 1996 at the University of Massachusetts Medical School in Worcester, Massachusetts.

17.     Dr. Breda has been a physician specializing in internal medicine for over twenty years. He has been continuously certified by the American Board of Internal Medicine since 2000, and is licensed to practice medicine in Rhode Island, Massachusetts, and New Hampshire.

18.     Dr. Breda completed his internship at Metro-West Medical Center in Framingham, Massachusetts in 1997. He completed his residency in internal medicine at the Brown University Miriam Hospital (Lifespan) in Providence, Rhode Island, from 1997 to 1999.

19.     Dr. Breda received an academic appointment as an instructor at Harvard Medical School in 2001 and served in that role until 2004.

20.     Dr. Breda is an experienced and accomplished practicing physician. He worked at a number of facilities throughout the Northeast and served in various roles. For the majority of his 21-year career, he has maintained a very busy practice, working in an out outpatient setting during the day and an inpatient setting in the evenings. He has no history of medical malpractice claims or settlements, no adverse board actions, and no history of adverse patient outcomes.

21.    Dr. Breda began his medical career practicing primary care and urgent care at Harvard Vanguard Medical Associates and Harvard University Health Services, in affiliation with Brigham and Women's Hospital and Beth Israel Hospital in Boston, MA (1999-2004).

22.    He has also practiced primary outpatient adult care at Emerson Hospital (2004-2005); Bridgewater Goddard Park Medical Associates (2006-2008); Wollaston Medical Associates (2008-2010); a contract-based private practice affiliated with Newton-Wellesley Hospital (2010-2012); Steward Medical Group, which is affiliated with Norwood Hospital and St. Elizabeth Hospital (2012-2014); and University Internal Medicine in Pawtucket, RI (2018).

23.    His experience also includes providing outpatient adult and pediatric urgent care at Doctor's Express Urgent Care (2012-2013); CareWell Urgent Care (2013-2015); Partners Urgent Care, an affiliate of Massachusetts General Hospital (2015-2017); and AFC Urgent Care (2012, 2017-2018).

24.    Dr. Breda has also worked in Intensive Care Units for Baystate Medical & Surgical (1999 - 2007) at Needham Glover Hospital (Beth Israel Deaconess-Needham); Metro-West Medical Center and Cambridge Health Alliance Hospitals; Radius Specialty Hospital (a long-term acute care facility - 2010-2013); and HealthSouth/Encompass Rehabilitation Hospitals (2010 - present).

25.    Dr. Breda has served in leadership positions within hospitals and healthcare facilities. From 2005 to 2006, he was the Clinic Director at Concentra Clinic in Pawtucket, RI. He completed approximately 6,000 annual patient visits, covering a full range of occupational injuries (both acute and chronic) and collaborating with occupational therapists and physical therapists. He also managed medical assistants and staff, performed site visits at workplaces to

assess etiologies of recurrent/clustered work-related injuries and proposed solutions, and reviewed worker's compensation and disability claims.

26.     From 2007 to 2010, he was the Director and Lead After-Hours Hospitalist at Whittier Rehabilitation Hospital in Westboro, MA, a 60-bed long term acute care facility.  There, he established and managed the physician after-hours hospitalist program, including the hiring, scheduling, and oversight of physicians.  His patient responsibilities included admissions and acute management of complex patients who were post-surgical, ventilator-dependent, post-trauma, post-intensive care unit, among other semi-acute conditions.

27.     From 2008 to 2010, he was a physician consultant to the Social Security Administration, where he reviewed Social Security claims.

28.     From 2005 to present, he has served as a Senior Aviation Medical Examiner to the Federal Aviation Administration, performing aviation medical exams on airmen, counseling them on health management to ensure compliance with FAA standards, and assisting airmen through the Special Issuance process.

**Facts Giving Rise to the Action**

29.     Dr. Breda joined the Providence Veterans Administration Medical Center in Providence, RI (the "V.A.") as a part-time emergency room physician on February 14, 2010.

30.     On June 6, 2014, Dr. Breda took voluntary leave from his position.  A few support staff members had complained about him to his direct supervisor, Dr. Wilfredo Curioso, and Dr. Breda asked to temporarily step back from the situation to prevent it from escalating. The Rhode Island Board of Medical Licensure and Discipline later determined the complaints to be unfounded.

31.     Dr. Breda remained on this voluntary leave until his separation from the V.A. in February of 2015.

32.     On June 10, 2014, Dr. Curioso delivered to Dr. Breda a letter that stated in relevant part:

> I have concerns about your performance as well as your conduct. Issues over the past several months have raised my concerns and I will be looking into issues more carefully.  Specifically, I will be interviewing staff with whom you have worked and I will be reviewing your medical charts from the past year.  While I look into these matters further, I will supervise you during each of your Emergency Room shifts… I will be reviewing these issues to determine appropriate action.  During this review, you will be working with me.

Exhibit A-7.

33.     On August 20, 2014, Medical Staff Chief Dr. Sharon Rounds, asked Dr. Breda to attend a meeting with herself, Dr. Curioso, and Ms. Tambra Holt (a human resource specialist). Dr. Rounds' email stated:

> As previously communicated, a fact finding is being conducted. The purpose of the meeting is to review concerns and provide an opportunity for you to respond to the concerns.  Documentation will not be provided prior to this meeting.  While there is no entitlement to legal representation, your attorney may accompany you to the meeting.  While you may consult with your attorney, you will be responsible for providing responses.

Exhibit A-8.

34.     Dr. Breda responded to Dr. Rounds by email the same day (Exhibit A-9), copying Ms. Holt and others, stating that he was willing to meet once he and his counsel had the opportunity to review the documentation regarding "the issues at hand", which Dr. Breda had requested before but not received.

35.     Human Resources Assistant Chief Rachel Sartini responded to Dr. Breda's email the same day, stating:

> As is customary with any fact finding, your presence is requested to discuss some concerns your department has and to solicit your side of the story.  There is no action being taken at this time.  Therefore, there is no evidence for you to review.  The meeting that will be held, based on your availability, will be for you to answer any questions and provide your Service with information to take into consideration before any final decision is made.

Exhibit A-9.

36.     The meeting took place on November 13, 2014.  Drs. Breda, Curioso, and Rounds, and Ms. Holt, attended.  Dr. Breda was not allowed to review the pertinent documents prior to the meeting, so he responded from memory to the best of his ability.

37.     The next day, Dr. Breda and Ms. Holt spoke multiple times by phone.  Ms. Holt's handwritten notes of their calls appear at Exhibit A-10.  Dr. Breda told Ms. Holt that he was considering resigning because Drs. Curioso and Rounds were treating him unfairly.

38.     Dr. Breda asked Ms. Holt if she and/or her department would help him try to transfer to a different V.A. facility in the area, and she agreed.  The V.A. has a process for transferring physician credentials to other facilities in the event of a physician transfer, and Dr. Breda hoped Ms. Holt could help him by keeping her ears open for nearby openings that might be a good fit for him.

39.     Dr. Breda also requested another meeting with Ms. Holt and Drs. Curioso and Rounds, as an effort to resolve the interpersonal issues before seriously pursuing a transfer to another V.A. facility.

40.     On December 11, 2014, Dr. Breda again met with Drs. Curioso and Rounds, and Ms. Holt.  Ms. Holt's handwritten notes appear at Exhibit A-12.  Dr. Breda and the other physicians were not able to resolve their differences.

41.     Dr. Rounds recommended to Dr. Breda that he should resign.  Near the end of the meeting, Dr. Breda announced that he was resigning.  Ms. Holt told him he needed to submit his resignation in writing.  Exhibit A-5, pp. 72-73, 99.

42.     The group discussed how a resignation would affect his personnel record.  Dr. Breda asked about his clinical privileges, and Ms. Holt suggested he contact the "credentialing department" with any privilege-related questions, as her office only handles employment issues.

43.     On December 16, 2014, Dr. Breda requested a mediation with Dr. Curioso.  The same day, Dr. Breda wrote to Ms. Holt and specified that his thoughts about resigning his employment at the Providence V.A. were based on his difficulties with Drs. Curioso and Rounds:

> I feel that I have exhausted all of my remedies at the VA in Providence… I feel that my department chair and immediate supervisors are on a witch hunt and have acted unreasonably and unfairly.  As a result, I plan to submit my resignation.

Exhibit A-16.

44.     On January 7, 2015, Alternative Dispute Resolution Coordinator Garfield Norris confirmed that Dr. Curioso had agreed to mediate, a process that he explained "is designed to help the participants explore their concerns, express their interests, and think of possible options that could effectively resolve the dispute."  Exhibit A-13.  The mediation was scheduled for February 24, 2015, and attendance was expressly limited to Drs. Breda and Curioso, Ms. Holt, two party representatives, and one neutral.

**Dr. Breda's Separation from the Providence V.A.**

45.     On February 3, 2015, notwithstanding the upcoming mediation, the Provide V.A. Medical Center Director, Dr. Susan MacKenzie, Ph.D., sent Dr. Breda a form letter notifying him that his appointment was being terminated, effective February 13, 2015, and that he was not entitled to have this decision reviewed.  Exhibit A-14.  Dr. Breda's five-year pension was set to vest the day after the effective termination date, February 14, 2015.

46.     The letter states that no actions had been taken with respect to Dr. Breda's clinical privileges, and that if his privileges were later revoked, it would not be reported to the NPDB unless there was a final determination that the revocation had been due to substandard care, professional incompetence, or professional misconduct.

47.     The letter repeatedly indicated that Dr. Breda's appointment and clinical privileges are separate interests controlled by different rules and different departments.  For instance:

        a.      The letter states that Dr. Breda's appointment is being terminated in accordance with V.A. Handbook 5021, Part VI.  This is a human resources/employment handbook entitled, "Employee/Management Relations," and the Responsible Office is "Human Resources Management Employee Relations and Performance Management Service, Office of Deputy Assistant Secretary for Human Resources and Labor Relations".  The handbook does not reference physician credentialing or privileges; it contains the general rules that govern all V.A. employees.

        b.      Under a separate heading, "Impact of Decision Regarding Clinical Privileges" (all-caps and bold print omitted), the letter refers Dr. Breda to "VHA Handbook 1100.17" and "VHA Handbook 1100.19".  These VHA Handbooks, which pertain to clinical

11

privileges and credentials, are handled by the Office of Quality and Performance, Office of Patient Care Services, Office of Medical-Legal Affairs, and Office of Quality, Safety, and Value.

c.   The letter states that involuntary termination of appointment, such as Dr. Breda's, is not reviewable.  However, it lays out procedures for any forthcoming actions on Dr. Breda's clinical privileges:   First, if his privileges were revoked in the future, an "initial determination" would be made as to whether the revocation resulted from substandard care, professional misconduct, or professional incompetence.   If so, Dr. Breda would have an opportunity for a fair hearing and appeal to determine whether the reasons for the revocation should be reported to the NPDB.

48.   On February 7, 2015, Dr. Breda emailed Ms. Holt a letter stating that he was resigning due to the ongoing issues with Drs. Curioso and Rounds: "Dr. Rounds and Dr. Curioso have continued to exhibit animosity towards me, have acted in bad faith and have tainted the workplace to such a degree that it would be difficult for me to work for them."  Exhibit A-15. Ms. Holt responded that his resignation would be effective February 7, 2015.

49.   Two days later, on February 9, 2015, Dr. MacKenzie notified Dr. Breda that the Providence V.A. was revoking his clinical privileges.

50.   If a physician's clinical privileges are revoked due to anything other than professional incompetence or professional misconduct, the revocation is not reportable to the NPDB.   The Providence V.A. never reported its revocation of Dr. Breda's privileges to the NPDB.

51.   On August 27, 2015, Dr. Breda's counsel sent a letter to the Providence V.A. that touched upon, among other things, Dr. Breda's separation from the Providence V.A. over six months earlier.

52.     The same day, the Providence V.A. convened a three-person committee, purportedly to determine whether Dr. Breda had resigned during an investigation into his professional competence or conduct.

53.     On September 1, 2015, Dr. Breda filed a civil action against the Providence V.A. and others, relating in relevant part to his separation.[1]

54.     On September 3, 2015, the three-person committee at the Providence V.A. met for a second time and ostensibly determined that, yes, Dr. Breda had resigned during an investigation into his professional competence or conduct, and he needed to be reported to the NPDB.

### The Adverse Action Report

55.     On October 27, 2015, over eight months after Dr. Breda's separation from the V.A. (and four days after the Providence V.A. moved to dismiss his lawsuit), the Providence V.A. filed an adverse action report against Dr. Breda in the NPDB.

56.     The adverse action report states that the following "Action" was taken: "Voluntary limitation, restriction, or reduction of clinical privilege(s), while under, or to avoid, investigation relating to professional competence or conduct".

57.     Dr. Breda had never been notified that he was under investigation into professional incompetence or misconduct.

58.     When filing an adverse action report, the reporting entity also selects up to four "Basis for Action" codes, which describe why the "Action" was taken.  There is no code for a resignation of employment, because that is not a basis for an adverse action report.  The

_____

[1] The case settled in December of 2016.

Providence V.A. selected Code 99: "Other – Not Classified, Specify," which is to be used only if there are no codes that match the actual basis for the "Action". The Providence V.A.'s specification states: "Resigned while under investigation".

59. When filing an adverse action report, the reporting entity also writes a brief "Description". The Providence V.A. wrote: "Provider resigned while under investigation".

60. The adverse action report states that both the "Effective date" and "Date of Action" are February 7, 2015, which is the day Dr. Breda emailed Ms. Holt and stated that he was resigning.

61. On February 7, 2015, Dr. Breda was not under investigation by a healthcare entity, and he never voluntarily restricted, reduced, or limited his clinical privileges. Further, a resignation of employment – whether during an investigation or not – is not reportable to the NPDB.

## V.A. Policy and Subsequent Testimony

62. The V.A. issued Policy Memorandum 05-29, entitled "Supervisory Fact Finding and Administrative Investigations" (the "V.A. Memorandum") on March 12, 2013. The V.A. Memorandum was in effect when the events underlying this action occurred. See Exhibit A-17.

63. The three-person committee at the Providence V.A. determined that Dr. Breda had resigned while under investigation and needed to be reported to the NPDB, by claiming that Dr. Curioso's June 10, 2014 letter constituted a "Fact Finding" under Policy 05-29.

64.   In fact, Dr. Curioso's letter did not constitute a "Fact Finding" because review by a supervisor is a preliminary step *before* a "Fact Finding" can take place.[2]

65.   The V.A. Memorandum provides for two distinct phases to address questions about a specific practitioner's competence or conduct: (a) "Fact Finding" and (b) "Administrative Board of Investigation" (AIB).

> (a)   Fact Finding is defined as: "An informal process to obtain and assemble readily available information about an event and their results which may be used for a variety of purposes, including determining the need for an Administrative Investigation Board (AIB)."  § 3.a.
>
> The process for initiating a Fact Finding is as follows:   "[U]pon [a supervisor's] discovery of an event that may require an independent review by management officials outside the service, the Chief of the Service will request a Fact Finding… This request, along with any other documentation, will be forwarded in writing to the Medical Center Director through the Executive Leadership member, who will appoint the Finder(s) of Fact."  § 5.a.(1).
>
> (b)   AIB is defined as:  "The standard procedures established under VA Direction 0700 and this Handbook for collecting and analyzing evidence, ascertaining facts, and documenting complete and accurate information regarding matters of interest to VA."  § 3.b.
>
> The process for initiating an AIB is as follows:  5.b.(1):  "Upon determination that an incident or allegation is beyond the scope of a Fact Finding, the Medical Executive Director, or his/her designee, will convene an Administrative Investigation Board."  § 5.b.(1).

66.   Dr. Rounds was deposed on October 13, 2016, as part of Dr. Breda's civil suit. Exhibit A-5.

67.   Dr. Rounds testified that Dr. Curioso had not reviewed Dr. Breda's cases as part of an "intense evaluation," despite Dr. Curioso writing in his June 10, 2014 letter that he would be taking a closer look at Dr. Breda's practice.  She testified, "[W]e review prospectively.  After

---

[2] Policy 05-29 provides:  "Normally, once a supervisor is made aware of an event/incident or allegation, this may be investigated by the immediate supervisor and no further action will need to be taken."  It goes on to describe the steps required to initiate a "Fact Finding".  § 5.a.(1).

informing the physician there's an issue, then we prospectively review; and there was nothing further to review [since Breda never returned to work after taking voluntary leave on June 6, 2014]." *Id.*, at 73:4-24.

68.     Dr. MacKenzie was also deposed on October 13, 2016 as part of Dr. Breda's civil suit.  Exhibit A-6.

69.     Dr. MacKenzie testified that she had never received a request for a Fact Finding (*id.*, at 67:5-13), which is an indispensable step *preceding* a Fact Finding under V.A. policy.

70.     Dr. MacKenzie also made clear that an AIB had never been convened: "a fact finding was conducted through the chain of command [referring to Curioso and Rounds]… it wasn't an investigation or a hearing.  We have a board of investigation process in the VA, administrative board of investigation, and we have a fact finding process, as well, so there's a distinction between the two of those." *Id.*, at 62:10-17.

### Administrative History

71.     On or about December 29, 2015, Dr. Breda submitted a Request for Secretarial Review of the AAR.  On or about March 24, 2016, Defendant Secretary denied the request for the AAR's removal.

72.     On or about March 15, 2017, Dr. Breda submitted a Request for Reconsideration (Exhibit A).  On or about October 17, 2017, Defendant Secretary denied the Request for Reconsideration, which concluded Dr. Breda's administrative remedies (Exhibit B).

73.     The Defendants concluded that the AAR was accurate as submitted and would remain in the NPDB.

## COUNT I
### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT
#### (With respect to the reportability of the event)

74.     The foregoing paragraphs are hereby re-alleged.  5 U.S.C. § 706 provides that a reviewing Court shall hold unlawful and set aside agency action, findings, and conclusions that it determines to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

75.     The adverse action report against Dr. Breda, filed by the Providence V.A., states, as its sole basis, "<u>resignation</u> while under investigation" (emphasis added).

76.     Resignation of employment is not reportable to the NPDB, whether it occurs during an investigation or not.  The report should not have been filed..

77.     It was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law for Defendants to conclude that the report should have been filed.


## COUNT II
### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT
#### (With respect to "clinical privileges")

78.     The foregoing paragraphs are hereby re-alleged.

79.     5 U.S.C. § 706 provides that a reviewing Court shall hold unlawful and set aside agency action, findings, and conclusions that it determines to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

80.     42 U.S.C. § 11133(a)(1)(B) provides that a healthcare entity must file an AAR with the NPDB against a physician when said entity "accepts the surrender of clinical privileges of a physician (i) while the physician is under an investigation by the entity relating to possible

17

incompetence or professional misconduct, or (ii) in return for not conducting such an investigation or proceeding."

81.     The adverse action report filed by the Providence V.A. states that Dr. Breda voluntarily reduced, restricted, or limited his <u>clinical privileges</u> while under investigation by a health care entity into his professional competence or conduct. (emphasis added).

82.     On February 7, 2015, Dr. Breda wrote to Ms. Holt and stated that he was resigning.  Ms. Holt wrote to Dr. Breda that his resignation would be effective that day.

83.     Dr. Breda's resignation was not an action on his clinical privileges.  At the December 2014 meeting, he had learned that Ms. Holt's department only handled employment issues, and that he needed to contact the credentialing department for issues related to his clinical privileges.  He did not contact the credentialing department about his clinical privileges.

84.     Dr. Breda still planned to transfer to another V.A. facility in the area, and he hoped Ms. Holt would still help him find a suitable transfer position.

85.     On February 9, 2015, the Providence V.A. notified Dr. Breda that it was revoking his privileges, unilaterally.

86.     Dr. Breda never voluntarily surrendered, restricted, reduced, or limited his clinical privileges.  The report is not accurate and should not have been filed.

87.     It was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law for Defendants to conclude that the report is accurate and should have been filed.


### COUNT III
### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT
### (With respect to "an investigation")

88.     5 U.S.C. § 706 provides that a reviewing Court shall hold unlawful and set aside agency action, findings, and conclusions that it determines to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

89.     42 U.S.C. § 11133(a)(1)(B) provides that a healthcare entity must file an AAR with the NPDB against a physician when said entity "accepts the surrender of clinical privileges of a physician (i) while the physician is under an investigation by the entity relating to possible incompetence or professional misconduct, or (ii) in return for not conducting such an investigation or proceeding."

90.     The adverse action report filed by the Providence V.A. states that Dr. Breda voluntarily reduced, restricted, or limited his clinical privileges while under investigation by a health care entity into his professional competence or conduct.

91.     For NPDB reporting purposes, an "investigation" is a "formal, targeted process."

92.     On February 7, 2015, the Providence V.A. had not undertaken a "formal, targeted process" to inquire into Dr. Breda's professional competence or conduct.

93.     A letter from an individual supervisor stating that he has concerns and will be working closely with Dr. Breda does not constitute a "formal, targeted process."

94.     V.A. policy provides that any inquiry short of an "Administrative Investigation Board" (AIB) is explicitly "informal," which is the very opposite of a "formal, targeted process". Dr. MacKenzie, the Medical Center Director, testified under oath that an AIB was never convened with respect to Dr. Breda.

95.     The report is not accurate and should not have been filed.

96.     It was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law for Defendants to conclude that the report is accurate and should have been filed.

## COUNT IV
## VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT
### (With respect to "a healthcare entity")

97.     The foregoing paragraphs are hereby re-alleged.

98.     5 U.S.C. § 706 provides that a reviewing Court shall hold unlawful and set aside agency action, findings, and conclusions that it determines to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

99.     42 U.S.C. § 11133(a)(1)(B) provides that a healthcare entity must file an AAR with the NPDB against a physician when said entity "accepts the surrender of clinical privileges of a physician (i) while the physician is under an investigation by the entity relating to possible incompetence or professional misconduct, or (ii) in return for not conducting such an investigation or proceeding."

100.     The adverse action report filed by the Providence V.A. states that Dr. Breda voluntarily reduced, restricted, or limited his clinical privileges while under investigation by a health care entity into his professional competence or conduct. (emphasis added).

101.     For NPDB reporting purposes, a "healthcare entity" means: (i) a hospital that is licensed to provide health care services by the State in which it is located, (ii) an entity (including a health maintenance organization or group medical practice) that provides health care services and that follows a formal peer review process for the purpose of furthering quality health care (as determined under regulations of the Secretary), and (iii) subject to subparagraph (B), a professional society (or committee thereof) of physicians or other licensed health care practitioners that follows a formal peer review process for the purpose of furthering quality health care (as determined under regulations of the Secretary).  42 U.S.C. § 11151(4).

102.    An individual staff member is not a "healthcare entity".

103.    On June 10, 2014, Dr. Curioso indicated by letter that he, personally, would be taking a closer look at Dr. Breda's practice.  This is the basis of Defendants' conclusion that the report is accurate and should have been filed.

104.    Dr. Curioso is not a "healthcare entity".  The report is not accurate and should not have been filed.

105.    It was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law for Defendants to conclude that the report is accurate and should have been filed.


## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court order Defendants to void and remove the report, and to inform each and every entity to which it has disbursed the report that the report has been voided and removed, and grant Plaintiff such other and further relief as the Court deems just and proper.


## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury in this action.

_____

Date:   November 15, 2020

Respectfully submitted,


/s/ Barry Coburn
Barry Coburn
D.C. Bar No. 358020
Coburn and Greenbaum, PLLC
1710 Rhode Island Ave., NW
Second floor
Washington, D.C. 20036
(202) 643-9472
barry@coburngreenbaum.com