## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JOHN A. BREDA,

          *Plaintiff*,

    v.

UNITED STATES OF AMERICA, *et al.*,

          *Defendants*.

Civil Action No. 20-3308 (RDM)

## <u>MEMORANDUM OPINION</u>

Plaintiff Dr. John Breda challenges the decision of the Secretary of Health and Human Services ("Secretary") to maintain a report on file with the National Practitioner Data Bank ("NPDB") regarding his loss of clinical privileges at the Providence Veterans Administration Medical Center (the "Hospital"), where he previously worked.  Dkt. 1 (Compl.).[1]  The matter is now before the Court on cross-motions for summary judgment.  Dkt. 15; Dkt. 17.  Because Breda has failed to identify a convincing basis for setting aside Defendants' decision, the Court will **DENY** his motion for summary judgment, Dkt. 15, and will **GRANT** Defendants' cross-motion for summary judgment, Dkt. 17.

## I.  BACKGROUND

### A.    Statutory and Regulatory Background

Congress enacted the Health Care Quality Improvement Act in 1986 to address "a national need to restrict the ability of incompetent physicians to move from State to State without

---

[1] Defendants are: the United States, the United States Department of Health and Human Services, the Secretary of the United States Department of Health and Human Services Xavier Becerra, and the National Practitioner Data Bank.  Dkt. 1 at 1 (Compl.).

disclosure or discovery of the physician's previous damaging or incompetent performance." 42 U.S.C. § 11101(2).  Among other things, the Act requires "health care entit[ies]" to report to the Secretary (through the relevant Board of Medical Examiners) certain adverse events related to the clinical privileges of their physicians.  *Id.* §§ 11133(a)–(b), 11134.  A health care entity must file a report when it "takes a professional review action that adversely affects the clinical privileges of a physician for a period longer than 30 days."  *Id.* § 11133(a)(1)(A).  It must also do so when it "accepts the surrender of clinical privileges of a physician" while that physician "is under an investigation by the entity relating to possible incompetence or improper professional conduct" or if the physician surrenders her privileges "in return for" the entity "not conducting such an investigation or proceeding."  *Id.* § 11133(a)(1)(B).  The Department of Health and Human Services ("HHS") publishes these adverse-action reports, along with any response provided by the physician, in the NPDB.  45 C.F.R. §§ 60.1, 60.2.

The NPDB serves an important, patient-protective purpose.  Whenever a physician applies to join a hospital's staff or to receive clinical privileges there, the hospital must query the NPDB regarding the physician.  42 U.S.C. § 11135(a)(1).  Hospitals must also check the NPDB every two years for any new adverse-action reports concerning the physicians they employ or to whom they grant clinical privileges.  *Id.* § 11135(a)(2).  A hospital that shirks these obligations is charged with knowledge of any adverse-action reports respecting their physicians in malpractice litigation.  *Id.* § 11135(b).  The goal of this system is to prevent physicians from "being able to hide disciplinary actions that have been taken against [them]."  *Leal v. Sec'y of U.S. Dep't of Health and Hum. Servs.*, 620 F.3d 1280, 1283 (11th Cir. 2010).

For obvious reasons, physicians are not keen on appearing in the NPDB.  Recognizing the professional implications of being the subject of an adverse-action report, Congress directed

the Secretary to provide procedures for physicians to challenge allegedly inaccurate reports, which the Secretary has done.  42 U.S.C. § 11136(2); 45 C.F.R. § 60.21.  But this review is limited: the Secretary does not adjudicate challenges to the "hospital's adverse action"—*i.e.* the hospital's decision to restrict the physician's clinical privileges or accept the physician's surrender of them.  *Leal*, 620 F.3d at 1283.  Nor does the Secretary make factual findings regarding whether the "incidents listed in the report"—*i.e.* the physician's deficient conduct— "actually occurred."  *Id.* at 1284.  In other words, the Secretary "will not consider the merits or appropriateness of the action or the due process that the subject received."  45 C.F.R. § 60.21(c)(1).  Instead, he determines only whether (1) a report is based on an adverse action that is in fact reportable under the Act and (2) whether the report has accurately described such adverse action.  *Id.* § 60.21(c).

**B.     Factual Background**

Breda began working at the Hospital in 2010.  Dkt. 26-4 at 78 (J.A. 681).  After several co-workers complained about his clinical performance and conduct, he took a voluntary leave of absence in June 2014.  Dkt. 26-2 at 8 (J.A. 7); Dkt. 26-3 at 344–49 (J.A. 465–70).  Several days after Breda's leave began, his supervisor, Dr. Wilfredo Curioso, sent him a letter with the subject line "Fact Finding."  Dkt. 26-4 at 45 (J.A. 577).  Curioso expressed "concerns" about Breda's performance and conduct, including his "writing prescriptions for the wrong patients, diverting an ambulance for a laceration injury[,] consenting the wrong patient for blood transfusion," and delaying "seeing patients" complaining of "chest pain."  *Id.*  Curioso said that he would be "looking into issues more carefully" and reviewing them to "determine appropriate action."  *Id.* He also explained that he would interview the staff with whom Breda had worked, review the

medical charts from Breda's cases over the past year, and supervise all of Breda's emergency room shifts. *Id.*

As part of this inquiry, Breda met in November 2014 with Curioso, Dr. Sharon Rounds, the Chief of the Hospital's Medical Service, and representatives from the Hospital's human resources department. Dkt. 26-3 at 376 (J.A. 497); Dkt. 26-4 at 47, 79 (J.A. 579, 682). When requesting and scheduling this meeting, both representatives from human resources and Rounds referred to it as part of an ongoing "fact finding" of which Breda was the subject. Dkt. 26-3 at 376 (J.A. 497); Dkt. 26-4 at 47 (J.A. 579). At the meeting, Curioso and Rounds questioned Breda about various cases and sought explanations for the clinical decisions he had made. Dkt. 26-3 at 352–61 (J.A. 473–82). This exercise apparently went poorly, because Breda called human resources the next day and suggested that he might resign his position. Dkt. 26-4 at 89–90 (J.A. 692–93). In this same conversation, he asked for the assistance of human resources in finding a position at another institution, and notes from the call indicate that human resources agreed to provide Breda with the contact information of other VA hospitals in the area. *Id.* at 90 (J.A. 693).[2]

At Breda's request, Curioso and Rounds met with him again in December. Dkt. 26-4 at 52–53 (J.A. 584–85); Dkt. 26-3 at 350–51 (J.A. 471–72). This time Rounds suggested that Breda consider resigning, and Breda responded that he was planning to do so. Dkt. 26-3 at 350–51 (J.A. 471–72); Dkt. 26-4 at 38 (J.A. 570) (Rounds Dep.). Human resources informed Breda

---

[2] These notes run slightly off the page of the joint appendix, but the Court can discern most of the words. Dkt. 26-4 at 90 (J.A. 693). Moreover, Defendants' brief recounts the relevant notes in full in a manner that is consistent with what is intelligible to the Court, and Breda has not disputed Defendants' transcription. Dkt. 17-1 at 33.

that his record would reflect his resignation and that the Hospital's credentialing department could answer any questions he had related to his clinical privileges. Dkt. 26-3 at 351 (J.A. 472).

Breda's resignation was not immediately forthcoming, so in January 2015 Rounds recommended to the Hospital Director, Sharon MacKenzie, that the Hospital terminate Breda. Dkt. 26-3 at 341–43 (J.A. 462–64). Rounds detailed "multiple, documented, not otherwise explained deficiencies" with Breda's clinical and professional competencies that he had failed adequately to address at their meetings. *Id.* at 341–43 (J.A. 462–64). She based her recommendation on "records from 2010, 2011, and 2012 of complaints and verbal and written counseling of Dr. Breda . . . [,] concerns brought forward by Emergency Department nurses in 2014, the medical record reviews done by Dr. Curioso on each incident, and the verbal responses of Dr. Breda to each concern that [was] expressed during [the November] meeting." *Id.* at 341 (J.A. 462). Rounds also detailed specific incidents involving each of five "core [physician] competencies," including "Patient Care," "Medical Knowledge," "Practice Based Learning and Improvement," "Systems Based Practice," and "Professionalism." *Id.*; *see also id.* at 342–43 (J.A. 463–64) (listing specific incidents).

MacKenzie concurred with Rounds' recommendation, and on February 3, 2015 she wrote Breda to tell him that his appointment would be terminated effective February 13. Dkt. 26-3 at 338–39 (J.A. 459–60). In a paragraph titled "**IMPACT OF DECISION REGARDING CLINICAL PRIVILEGES**," the letter explained that, if an initial determination was made that "the reasons for [Breda's] termination and subsequent revocation of privileges" were "substandard care, professional misconduct or professional incompetence," he would receive a hearing and appeal regarding that determination. *Id.* at 338 (J.A. 459). And if the Hospital

5

ultimately concluded that Breda's privileges were revoked for the above-listed reasons, it would file an NPDB report. *Id.*

A separate heading, "**IMPACT OF VOLUNTARY SURRENDER OF PRIVILEGES**," preceded the following paragraph:

> *Should you* surrender or voluntarily accept a restriction of your clinical privileges, or *resign* or retire from your medical staff position with the Department of Veterans Affairs *prior to the effective date of your termination*, *your* fair hearing and appeal *rights regarding privileges will be limited to a hearing on whether you took such action while under investigation for professional incompetence, professional misconduct or substandard care*.

*Id.* at 339 (J.A. 460) (emphasis added).

Notwithstanding his impending termination, Breda submitted a letter of resignation on February 7, 2015. *Id.* at 333 (J.A. 454). Although Breda (incorrectly) dated this letter February 1, 2015 and requested that his resignation be backdated to December 16, 2014, he was informed that his resignation would be effective on February 7—the day that the Hospital received his letter via email. *Id.* at 330 (J.A. 451). In addition, in the words of Breda's own counsel, Breda "did not follow [the] prompting [from human resources] to contact the 'credentialing department' about his privileges." Dkt. 26-4 at 82 (J.A. 685).

Two days later, on February 9, the Hospital's Medical Executive Committee ("MEC")—a committee of physicians and other senior Hospital personnel—convened to consider the results of the inquiry into Breda's performance. Dkt. 26-3 at 334–35 (J.A. 455–56). The MEC voted unanimously to revoke Breda's clinical privileges, finding that his performance demonstrated "substandard care, professional misconduct[,] or professional incompetence." *Id.* at 335–36 (J.A. 456–57). MacKenzie wrote Breda that same day, informing him of the MEC's decision and of his appeal rights regarding whether an NPDB report would be filed. *Id.* at 336 (J.A. 457). Her letter also stated:

> Should you surrender or voluntarily accept a restriction of your clinical privileges, including by resignation or retirement while your professional competence or professional conduct is under investigation during these proceedings or to avoid investigation, you forfeit the right a fair hearing and appeal process and the VA is required to file a report to the NPDB[.]

*Id.*

As it turns out, the MEC had labored under two misapprehensions.  First, it was apparently unaware that Breda had already resigned.  *Id.* at 335 (J.A. 456) (noting, in minutes from the MEC meeting, that "Dr. Breda did state [previously] that he would resign but had not resigned as of the date of the [MEC] meeting").  Second, the MEC seems to have been under the impression that it had the authority to revoke Breda's clinical privileges.  *Id.*  It did not.  Dkt. 26–4 at 147 (J.A. 750); *id.* at 205–08 (J.A. 808–11).  Rather, under the Hospital's policies, the MEC could *recommend* the revocation of privileges, but the final decision rested with MacKenzie.  *Id.* at 205–08 (J.A. 808–11).  So, although the MEC voted to revoke Breda's privileges, in practice it merely voted to recommend that MacKenzie do so.

Later that week, MacKenzie notified Breda that the Hospital planned to file an NPDB report stating that he had "resign[ed] during an investigation relating to possible professional incompetence or improper professional conduct."  Dkt. 26-3 at 326 (J.A. 447).  She noted that he had been informed in both the February 3, 2015 letter regarding his termination and the February 9, 2015 letter following the MEC decision that resigning "during the pendency of an investigation" would limit his appeal rights to the issues of whether he had resigned and, if so, whether an investigation had been pending at the time.  *Id.*

Breda appealed MacKenzie's decision, and the Hospital convened a review committee to adjudicate the appeal (referred to as the "Jankowich Committee" after its chair, Dr. Matthew Jankowich).  The Committee's sole task was to determine whether Breda "in fact resign[ed]

while under investigation, or to avoid further investigation or action." Dkt. 26-3 at 71 (J.A. 192).

After two days of hearings, the Committee concluded that he had. *Id.* at 71, 73, 74 (J.A. 192,

194, 195).  Breda appealed again, this time to the Network Director of the VA New England

Health System, but the Network Director denied his appeal. *Id.* at 13 (J.A. 134).

The Hospital filed an adverse-action report with the NPDB on October 27, 2015.  Dkt.

26-3 at 16–17 (J.A. 137–38).  The NPDB's system classified the report as "Voluntary Limitation,

Restriction, or Reduction of Clinical Privilege(s), while under, or to avoid, investigation relating

to professional competence or conduct." *Id.* at 17 (J.A. 138).  In the report, the Hospital

described the incident as "Provider Resigned While Under Investigation." *Id.*  Breda then sought

Secretarial review, contending that the adverse-action report was unsubstantiated and should be

rescinded.  Dkt. 26-2 at 8–15 (J.A. 7–14).  He raised a number of objections, among them that

the Hospital never "investigat[ed]" him within the meaning of the statute and VA policies. *Id.* at

8–13 (J.A. 7–12).

The Secretary denied Breda's appeal.  Dkt. 26-4 at 2–8 (J.A. 521–27).  Citing several

letters that MacKenzie had sent to Breda as well as the Jankowich Committee's memorandum,

the Secretary concluded that "[t]he record clearly shows" that Breda had resigned while subject

to an investigation for "professional incompetence or improper professional conduct." *Id.* at 5

(J.A. 524); *see also id.* at 6 (J.A. 525) ("[T]he record shows that you resigned while under

investigation."); *id.* ("The record shows you were under investigation for professional

incompetence or improper professional conduct.").

Almost a year later, Breda asked the Secretary to reconsider his decision. *Id.* at 9 (J.A.

541).  Through counsel, Breda submitted additional evidence and raised two primary points of

error:  First, he revived his contention that no "investigation" had taken place, as that statutory

term is properly understood. *Id.* at 10 (J.A. 542).  Second and relatedly, he argued that he had

not been investigated by a "health care entity," as the Act requires. *Id.* at 10 (J.A. 542).

The Secretary was again unconvinced. *Id.* at 74 (J.A. 606).  His decision cited to both the

Jankowich Committee's memorandum and the findings of the VA New England Health System

Network Director and concluded that, contrary to Breda's assertions, the record supported the

conclusion that he had resigned while under investigation. *Id.* at 73–74 (J.A. 605–06).

## C.   Procedural Background

Breda filed this lawsuit on November 15, 2020.  Dkt. 1 (Compl.).  He raised several of

the issues that he had litigated before the agency as well as a new contention: although he had

resigned his employment with the Hospital, he had not surrendered his clinical privileges in so

doing. *Id.* at 14, 17 (Compl. ¶¶ 61, 74–77).   The Hospital, he asserted, had improperly conflated

the two distinct concepts. *Id.*  In light of this new theory, the Court, at the parties' request,

stayed the case and remanded it to the agency so that the Secretary could consider Breda's

argument in the first instance.  Dkt. 9 at 12; Min. Order (Apr. 1, 2021).

On remand, the Secretary initially concluded that Breda might be right, although only

right enough for a pyrrhic victory.  He wrote the Hospital to explain that there was "insufficient

documentation to support or to substantiate the Report as submitted"—namely, to support the

assertion that Breda had surrendered his privileges.  Dkt. 26-4 at 143–44 (J.A. 746–47).  Rather,

the record indicated that the Hospital had revoked Breda's privileges. *Id.* at 144 (J.A. 747).  As

such, the Secretary instructed the Hospital to correct the report. *Id.*

The Hospital disagreed that there was any inaccuracy in its original report.  Dkt. 26-4 at

146 (J.A. 749).  It explained that under Veterans Administration ("VA") policy, "[d]ismissal

constitutes a revocation of privileges, whether or not there was a separate and distinct privileging

9

action." *Id.* (quoting Dep't of Veterans Affs., Veterans Health Admin., *VHA Handbook* 55 (2012) ("VHA Handbook")). And, more importantly for present purposes, although a physician is entitled to a post-termination review process, if the physician "resigns during an investigation," the scope of this process is significantly constrained. *Id.* at 147 (J.A. 750). A physician who resigns while under investigation may not challenge the merits of the revocation of his privileges; he is entitled to a hearing only "to determine whether the physician's resignation occurred during . . . an investigation" into his competence or conduct. *Id.* If so, the Hospital must file an NPDB report. *Id.* The Hospital noted that the VHA Handbook provides practitioners the following warning:

> If you surrender or voluntarily accept a restriction of your clinical privileges, including by resignation or retirement, while your professional competence or professional conduct is under investigation during these proceedings or to avoid investigation, VA is required to file a report to the NPDB . . . .

*Id.* (quoting VHA Handbook, *supra*, at app. E at 2).

Here, the Hospital further explained, Breda was notified that he would be terminated, which would automatically cause a revocation of his privileges, and, more importantly, he was informed of the consequences of resigning before his termination (and the concomitant revocation of his privileges) took effect. *Id.* Yet he resigned all the same. As a result, he surrendered his privileges and gave up his right to challenge that loss of privileges, as discussed above. *Id.* The bottom line, said the Hospital, was that "Dr. Breda's resignation had the effect of surrendering his privileges." *Id.* at 148 (J.A. 751); *see also* Dkt. 26-3 at 76–77 (J.A. 197–98) ("[The] VA is required to report the following actions to the NPDB . . . [a]cceptance of the surrender of clinical privileges, including the surrender of clinical privileges inherent in resignation . . . by a physician . . . while under investigation by the health care entity relating to possible incompetence or improper professional conduct . . . .").

Satisfied with this additional explanation, the Secretary denied Breda's request to void the adverse-action report. Dkt. 26-4 at 239 (J.A. 842).[3]  The Secretary endorsed the key points from the Hospital's submission and emphasized that the February 3, 2015 letter notifying Breda that he would be terminated said, in a paragraph entitled "**IMPACT OF VOLUNTARY SURRENDER OF PRIVILEGES**," that resignation would limit his hearing rights with respect to his privileges.  *Id.* at 242 (J.A. 845).  In his view, this paragraph informed Breda "that a resignation of [Breda's] medical staff position would also result in [a] surrender of clinical privileges."  *Id.*  The Secretary was also unpersuaded by Breda's insistence that the Hospital had represented to him that his resignation would not affect his clinical privileges.  *Id.* at 242–43 (J.A. 845–46).  "The alleged inaccuracy of these representations," the Secretary explained, "had no impact" on the Hospital's determination that Breda's privileges would be revoked "concurrently with [his] separation on February 13, 2015."  *Id.*

Following this decision, Breda filed an amended complaint in this action, averring that the Secretary's decision to maintain the report violated the Administrative Procedure Act ("APA").  Dkt. 12 at 19–25 (Am. Compl. ¶¶ 86–128).  The parties' cross-motions for summary judgment are now before the Court.  Dkt. 15; Dkt. 17.

## II.  STANDARD OF REVIEW

The APA directs courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, [] otherwise not in accordance with law," or "unsupported by substantial evidence."  5 U.S.C. § 706(2)(A), (E).  Agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to

---

[3] The decision is signed by Carolyn Nganga-Good, Chief, Policy and Dispute Resolution Division of Practitioner Data Bank, acting on behalf of the Secretary.  Dkt. 26-4 at 245 (J.A. 848).

consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  The Court must ensure that "the process by which [the agency] reache[d] [its] result [was] logical and rational." *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (quoting *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998)).  In doing so, however, the Court must "not . . . substitute its [own] judgment for that of the agency." *State Farm*, 463 U.S. at 43.  Rather, "[t]he [C]ourt will ordinarily uphold an agency's decision so long as the agency 'examined the relevant data and articulated a satisfactory explanation for its action, including a rational connection between the facts found and the choice made.'" *Animal Legal Def. Fund v. Perdue*, 872 F.3d 602, 611 (D.C. Cir. 2017) (alterations omitted) (quoting *State Farm*, 463 U.S. at 43).

Similarly, an agency's decision is supported by substantial evidence in the record if it finds support in "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Butler v. Barnhart*, 353 F.3d 992, 999 (D.C. Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  The substantial-evidence test requires "more than a scintilla, but can be satisfied by something less than a preponderance of the evidence." *Id.* (internal quotation marks omitted).  As the D.C. Circuit has explained, "[w]hen the arbitrary or capricious standard is performing th[e] function of assuring factual support, there is no substantive difference between what it requires and what would be required by the substantial evidence test." *Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 745 F.2d 677, 683–84 (D.C. Cir. 1984).

In an APA case, summary judgment "serves as a 'mechanism for deciding, as a matter of law, whether the agency action is . . . consistent with the APA standard of review.'" *Fisher v.*

*Pension Benefit Guar. Corp.*, 468 F. Supp. 3d 7, 18 (D.D.C. 2020) (quoting *Cayuga Nation v. Bernhardt*, 374 F. Supp. 3d 1, 9 (D.D.C. 2019)).  In essence, "the district judge sits as an appellate tribunal," and "the entire case on review is a question of law."  *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (internal quotation marks omitted).

### III.  ANALYSIS

Breda raises two sets of arguments: he first contends that he did not surrender (or did not voluntarily surrender) his privileges at the Hospital, and he then insists that even if he did surrender his privileges, that action did not constitute a reportable event.

### A.

Breda's first attack on the Secretary's decision is the one he raised in his most recent bid before the agency: he maintains that, when he resigned from his position with the Hospital, he did not thereby surrender his clinical privileges.  He presses a number of arguments in support of this contention, which the Court will address in turn.[4]

#### 1.

Breda first maintains that the Hospital revoked his privileges on February 3, 2015, so he could not have surrendered them when he resigned four days later.  Dkt. 15-1 at 24–25.  As he sees it, there was nothing left to surrender.  From the Court's review of the record, it does not appear that Breda clearly raised this contention before the Secretary—presumably for good reason, since "a professional review action that adversely affects the clinical privileges of a

---

[4]  In his opening brief, Breda asserts in passing that if the Secretary declined to rescind the report because he believed that he had no authority to do so, he was mistaken.  Dkt. 15-1 at 22–23.  Because the premise of this argument is unfounded—the Secretary did not indicate that he lacked authority to vacate the report—the Court need not address this contention.  *See* Dkt. 17-1 at 12 ("Pursuant to 42 U.S.C. § 11136, HHS has established procedures allowing a physician who is the subject of a Data Base report to dispute the accuracy of the report.").

physician for a period longer than 30 days" is a reportable event.  42 U.S.C. § 11133(a)(1)(A).

But, in any event, even assuming that Breda preserved this argument, it is without merit.  It is

clear from the record that Breda's privileges were intact when he resigned.  The February 3,

2015 letter that MacKenzie sent Breda states that Breda's appointment would be terminated

"effective February 13, 2015."  Dkt. 26-4 at 55 (J.A. 587).  So until February 13, 2015, Breda's

termination—and the resultant revocation of his clinical privileges—was *not* effective.

MacKenzie's letter also refers to Breda's "termination and *subsequent revocation of privileges*."

*Id.* (emphasis added).  This is an unmistakable indication from the Hospital that it would revoke

Breda's privileges no earlier than the effective date of his termination—that is, February 13.  *See*

Dkt. 26-4 at 242–43 (J.A. 845–46) (recognizing repeatedly, in the Secretary's decision, that,

based on the Hospital's actions, Breda's privileges "would be revoked concurrently with [his]

separation on February 13, 2015").

Recognizing the difficulty with his argument, Breda shifts gears slightly and maintains

that, even if his termination had not gone into effect when he resigned, the Hospital had "decided

to" terminate him and to revoke his privileges prior to his resignation.  Dkt. 15-1 at 24.  The

relevant event, he posits, is the Hospital's decision, not its actual termination of him and

revocation of his privileges.  *Id.* at 15.  The Court is again unpersuaded.  So long as Breda

possessed his privileges, he could give them up, regardless of whether he would have otherwise

lost them at some future time.  Not only that, what the Hospital actually "decided" to do was to

maintain Breda's employment until February 13, 2015 and to leave his privileges in place

pending further action on the Hospital's part.  Breda thus remained employed by the Hospital—

privileges and all—on the day he resigned.  Finally, if, as Breda contends, the critical point is the

moment of decision, it would seem that Breda "decided" to resign when he told Rounds and

Curioso he would do so, in December 2014.  And if that is treated as the date of his resignation, he is no better off, because he would have resigned before the Hospital terminated him.  In any event, it is far better to focus on the parties' actions, and such a focus leaves no doubt that Breda could still meaningfully resign and surrender his privileges on February 7, 2015.  Dkt. 26-3 at 333 (J.A. 454).

2.

Breda next argues that he did not surrender his clinical privileges when he resigned because that is not what he thought he was doing nor what he wanted to do.  He comes at this point from two angles: First, he contends that the Hospital did not provide him notice that his resignation would affect a surrender of his privileges and in fact led him to believe the opposite.  Second, and relatedly, he maintains that he did not subjectively intend to surrender his privileges when he resigned.  Both lines of argument fail as a matter of law and fact.

To start, Breda's arguments fail as a matter of law.  Recall that under the statute the Hospital's reporting requirement was triggered by its "accept[ance of] the surrender of [Breda's] clinical privileges."  42 U.S.C. § 11133(a)(1)(B).  The only question the Secretary was asked to answer—indeed, the only question he had authority to answer—is whether the Hospital in fact accepted the surrender of Breda's privileges.  45 C.F.R. § 60.21(c)(2)(i) (explaining that Secretarial review assesses only whether information in an adverse-action report is "accurate and reportable").  The answer to that question does not turn on Breda's subjective intent or the clarity of the Hospital's warnings.  This much is clear from the text of the Act, which conspicuously lacks modifiers like "*appropriately* accepts," "*correctly* accepts," or "*lawfully* accepts."  A reportable event requires only a "surrender" of privileges by "a physician" that a health care entity "accepts"—no more and no less.  42 U.S.C. § 11133(a)(1)(B).  The clarity of the notice

15

that the Hospital provided Breda regarding the consequences of his actions is therefore of no moment, nor is Breda's state of mind.  Dkt. 26-4 at 242–43 (J.A. 845–46) (recognizing as much).

Similarly, the plain meaning of § 11133(a)(1)(B), the structure of Act, and the Hospital's privileges policy all counsel against reading in a "voluntariness" or "knowing and informed consent" requirement.  Consider once more the operative statutory text: a health care entity shall file a report if it "accepts the surrender of clinical privileges of a physician . . . while the physician is under an investigation by the entity relating to possible incompetence or improper professional conduct."  42 U.S.C. § 11133(a)(1)(B)(i).  The critical word (besides "accepts") is "surrender."  And as used in this context, "surrender" means "to give up" or "to relinquish  . . . to the grantor."  *Surrender*, Webster's Third New International Dictionary (1993); *see also Doe v. Rogers*, 139 F. Supp. 3d 120, 145 (D.D.C. 2015) ("Congress's use of the term 'surrender' arguably intimates that it intended the statute to apply to any relinquishment of clinical privileges, whether voluntary or compelled . . . .").  What is required to "relinquish" clinical privileges to the hospital that granted the physician those privileges in the first place turns on the hospital's policy and procedures.  And Breda points to nothing in the Hospital's policies or procedures that even hints at a requirement that the physician act voluntarily or knowingly.  To the contrary, Breda does not dispute that, under VA policy, a physician who resigns "while [his] professional competence or professional conduct is under investigation" thereby "surrender[s]" his "clinical privileges."  Dkt. 26-3 at 317 (J.A. 438).[5]  Under this standard, neither voluntariness nor knowledge nor intent is at issue.

---

[5]  The Court's own review of the administrative record confirms that this was, in fact, the Hospital's policy.  *See, e.g.*, Dkt. 26-3 at 76–77 (J.A. 197–98) ("[The] VA is required to report . . . to the NPDB . . . [a]cceptance of the surrender of clinical privileges, including the surrender of clinical privileges inherent in resignation . . . by a physician . . . while under investigation by the heath care entity relating to possible incompetence or improper professional

The clear and unqualified requirements of both the Act and the VA's policy are no accident. Under § 11133(a)(1)(A), the paragraph immediately preceding the one at issue here, a health care entity must report to the NPDB if it "takes a professional review action that adversely affects the clinical privileges of a physician for a period longer than 30 days." 42 U.S.C. § 11133(a)(1)(A). If that were all that the Act provided, evading this requirement would be easy. A physician who saw the writing on the wall could preempt her employer and relinquish her privileges proactively to avoid an adverse-action report. That is where § 11133(a)(1)(B) and the VA's policy come into play: together, they prevent physicians from circumventing investigations into whether to revoke their privileges and avoiding NPDB reporting by beating their employers to the punch.

Add to all of this the fact that an unadorned requirement of "surrender"—without regard to subjective intent or desire—is more consonant with the limited scope of agency review than would be a requirement of voluntary or knowing and informed surrender. As explained above, the Secretary is required to determine whether the information reported by the health care entity "is accurate and reportable." 45 C.F.R. § 60.21(c)(2)(i). Thus, he would be obligated to direct the NPDB or the Hospital to revise or to rescind the report if, in fact, the Hospital had never accepted the surrender of Breda's clinical privileges. *Id.* § 60.21(c)(2)(ii), (iv). But at the same time, "[t]he [d]ispute [r]esolution process does *not* include reviewing[] [t]he underlying reasons

---

conduct . . . ."); *id.* at 185 (J.A. 306) ("The acceptance of the surrender of clinical privileges, including surrender of clinical privileges inherent in resignation . . . by a physician . . . while under investigation by the facility for possible incompetence or improper professional conduct . . . must be reported to the NPDB."); *id.* at 184 (J.A. 305) ("At the time a physician . . . surrenders, or voluntarily accepts restriction of clinical privileges, resigns, or retires from the medical position in VA while under investigation for possible professional incompetence or improper professional conduct, the physician must be formally notified that reporting to the NPDB is required.") .

for the report, such as the merits of a medical malpractice claim or the appropriateness of, or basis for, other types of reports."  U.S. Dep't of Health & Hum. Servs., *National Practitioner Data Bank Guidebook* F-5 (Apr. 2015), https://www.npdb.hrsa.gov/resources/2015NPDB Guidebook.pdf ("2015 Guidebook") (emphasis in original).  The Secretary recognized as much in his final decision, stating that any misunderstanding that Breda may have had regarding the connection between his resignation while under investigation and the loss of his clinical privileges "had no impact on the determination" by the Hospital that Breda's resignation resulted in the revocation of his privileges.  Dkt. 26-4 at 242–43 (J.A. 845–46); *id.* at 244 (J.A. 847) (similar).

More generally, "[t]he Secretary does not act as a factfinder deciding whether incidents listed in the report actually occurred or as an appellate body deciding whether there was sufficient evidence for the reporting hospital to conclude that those actions did occur."  *Leal*, 620 F.3d at 1284.  But a factfinder and appellate body is what he would become under Breda's approach.  He would be obligated to discern the intentions, motivations, and states of mind of the parties to determine whether decisions were made voluntarily and with adequate foreknowledge. To do so, he would presumably have to weigh conflicting testimony and make credibility determinations.  None of this is within the Secretary's bailiwick, and all of it is a far cry from the review in which he typically engages: a limited examination of hospital records to determine whether a reportable action occurred and has accurately been recounted.

Although there may be cases in which declining to require voluntariness or a knowing and informed decision might seem unfair, this is not one of them.  At the time Breda resigned, the Hospital had already decided to terminate him.  Dkt. 26-3 at 338–39 (J.A. 459–60).  Pursuant to Hospital policy, that meant a revocation of his privileges.  Dkt. 26-4 at 146 (J.A. 749).  And

before the MEC knew that Breda had resigned, it further recommended the revocation of his

privileges for incompetence and poor conduct.  Dkt. 26-3 at 335–36 (J.A. 456–57).  Breda's is

thus a paradigm case for § 11133(a)(1)(B)(i).  So even if his surrender of his privileges was not

voluntary in the fullest sense of the word, that just means that § 11133(a)(1)(B)(i) is working as

intended: to prevent physicians from avoiding the effects of foreseeably impending adverse

actions.

It bears repeating, moreover, that Breda does not dispute that, as a matter of fact, the

Hospital's policy is that a physician who resigns while under investigation surrenders his

privileges.  Dkt. 15-1 at 21 (noting that "the Hospital responded [to the NPDB's inquiry] with

written V.A. policies indicating that resignation of medical staff appointment automatically

terminates clinical privileges"); *see also* Dkt. 26-3 at 317 (J.A. 438).   Rather, he seems to

believe that because he wanted, contrary to Hospital policy, to decouple resignation and clinical

privileges, they should be treated as decoupled.  But fairness does not compel allowing the

desires of doctors to override the policies of hospitals.  Where, after all, would that end?  One

imagines that every doctor subject to investigation would like to be able to resign, in so doing

short circuit the hospital's investigation, and, no matter what hospital policies have to say about

the matter, keep his privileges.  The Court declines to read the statute to invite such

circumvention.

Even in cases further from § 11133(a)(1)(B)(i)'s heartland, concerns of unfairness do not

override the statutory mandate.  The Court does not doubt that being the subject of an NPDB

adverse-action report is a serious matter for a physician.  But as the Eleventh Circuit explained in

*Leal v. Secretary of the United States Department of Health and Human Services*, 620 F.3d 1280

(11th Cir. 2010), what a hospital that obtains information about a physician from the NPDB does

19

with that information "is entirely up to that hospital." *Id.* at 1284. The hospital is "free to ignore" it "or to investigate it" as it sees fit. *Id.* at 1285. Not only that, "a physician who is the subject of a report can [also] add a statement to the report giving his side of the story," and, with minor exceptions, that statement's content is "left entirely up to the physician." *Id.* Thus, a physician who surrenders her privileges without realizing that she has done so—perhaps she failed to read the hospital policy with sufficient care—can explain what happened in the comment field. That may be less than ideal for the physician, but "the Data Bank is not designed to provide protection to physicians at all costs, including the cost of not protecting future patients from problematic physicians." *Id.* For these reasons, fairness does not require a narrowing construction of the statute.

The best authority Breda marshals in opposition is *Simpkins v. Shalala*, 999 F. Supp. 106 (D.D.C. 1998), where the court did rely on a physician's intentions in concluding that he surrendered his privileges. In that case, a physician argued that although he had resigned from a hospital's staff, he had not surrendered his clinical privileges in so doing. *Id.* at 112. The hospital, much like the Hospital here, maintained that the doctor's "clinical privileges were co-extensive with his employment," an argument the Secretary accepted. *Id.* Judge Lamberth affirmed, concluding that the evidence was consistent with the doctor's having surrendered his privileges. *Id.* He explained that in "contemporaneous conversations" with the hospital's medical director, the doctor had "*clearly expressed a desire* to completely disassociate himself from the hospital," that the doctor "never practiced *nor sought to* practice medicine" at the hospital after his resignation, and that the doctor stated in his resignation letter that he was "leaving the hospital." *Id.* (emphasis added) (internal quotation marks omitted).

But although *Simpkins* considered the plaintiff-physician's "desire" with respect to his affiliation with the hospital, the Court is unmoved for two reasons.  First, for all of the reasons provided above, the Court is unpersuaded that a doctor's subjective intentions are controlling—unless, unlike in this case, the clinical-privileges policy of the hospital at issue requires some manifestation of subjective intent.  *Simpkins* considered the physician's intentions only implicitly and did not evaluate whether the statute or clinical-privileges policy at issue in that case looked to subjective intent.  Second, the most *Simpkins* might be read to stand for is that a physician's outward manifestation of an intent to surrender his clinical privileges constitutes evidence that he did, in fact, surrender those privileges.  *Simpkins* never suggests that a physician's unexpressed intentions can override a hospital's express policies.[6]

In any event, Breda's argument also fails as a matter of fact.  As the Secretary's final decision letter explains, the Hospital signaled to Breda in advance of his resignation that resigning would affect his privileges.  The Secretary recognized that it was the Hospital's policy that a dismissal automatically resulted in a revocation of privileges.  Dkt. 26-4 at 242 (J.A. 845).  Of particular relevance here, the Hospital referenced that policy—albeit somewhat elliptically—in the February 3, 2015 letter that Breda received regarding his termination.  The relevant paragraph was labeled, in bold and all capital letters: "**IMPACT OF VOLUNTARY SURRENDER OF PRIVILEGES**."  *Id.* at 127 (J.A. 730).  That paragraph, discussed in detail in the Secretary's decision, *id.* at 242 (J.A. 845), said:

---

[6] *Simpkins* is also distinguishable from this case because the *Simpkins* doctor's argument hinged on a fact not presented here: in addition to being on the medical staff of the hospital in question, he maintained privileges there through his faculty position at an affiliated university.  999 F. Supp. at 112.  His only contention was that resigning from the hospital did not impact his privileges *because of his university appointment*.  *Id.*  Breda has no similar argument available here.

> Should you surrender or voluntarily accept a restriction of your clinical privileges, or resign or retire from your medical staff position with the [VA] prior to the effective date of your termination, your fair hearing and appeal rights regarding privileges will be limited to a hearing on whether you took such action while under investigation for professional incompetence, professional misconduct or substandard care.

*Id.* at 127 (J.A. 730).  The Secretary reasonably concluded that this letter informed Breda that if he "resign[ed]" "prior to the effective date of [his] removal," his hearing rights would be "limit[ed]" and his "resignation . . . would . . . result in [the] surrender of clinical privileges."  *Id.* at 242 (J.A. 845).  After receiving this letter, Breda could not reasonably have believed that his resignation would have no bearing on his clinical privileges—or, as Breda puts it, that his resignation was "distinct" from a surrender of privileges.  *Id.* at 240 (J.A. 843).  After all, why would the Hospital have told Breda that resigning would curtail his appeal rights with respect to his privileges, unless his resignation would have a negative impact on his privileges?

    To be sure, as Breda argues, the February 3 letter could have made the connection between resignation and privileges even more express.  *See* Dkt. 15-1 at 25.  But the Secretary reasonably (and, indeed, correctly) found that it was sufficient.  Simply put, a physician who receives a two-page letter of such importance, which includes a paragraph that addresses the "**IMPACT OF VOLUNTARY SURRENDOR OF PRIVILEGES**," and which notes that, if he resigns prior to the effective date of his termination, he will lose certain fair hearing and appeal rights "regarding privileges"—yet nonetheless maintains that he was unaware that his resignation would affect his privileges—can only be described as willfully blind.  Breda also exaggerates things when he claims that the letter "never so much as hints at a possible nexus between the Data Bank and the termination of [his] employment, whether voluntary or involuntary."  Dkt. 15-1 at 26.  Quite to the contrary, the letter explains that if Breda were to resign, his appeal rights with respect to his "privileges" would be limited to a hearing regarding whether he resigned

"while under investigation for professional incompetence, professional misconduct or substandard care."  Dkt. 26-4 at 127 (J.A. 730).  This is an unmistakable reference to 42 U.S.C. § 11133(a)(B)(i), the provision that requires an adverse-action report when a physician surrenders his privileges "while . . . under an investigation" for "possible incompetence or improper professional conduct."  At the very least, a reasonable physician in Breda's position who was intent on keeping his privileges would have sought clarification before resigning.

Breda's insistence that the relevant paragraph of the February 3 letter "states only that resignation of employment would limit hearing rights on the Hospital's revocation of privileges" is likewise unfounded.  Dkt. 15-1 at 39.  The paragraph in fact states that if *Breda* were to resign, his "fair hearing and appeal rights regarding privileges [would] be limited to a hearing on whether *you took such action*"—*i.e.* whether "you," that is, Breda, resigned—"while under investigation for professional incompetence, professional misconduct or substandard care."  Dkt. 26-4 at 127 (J.A. 730) (emphasis added).  It thus clearly refers to the consequences of and hearing procedures related to possible actions Breda might take, not actions on the Hospital's part.

The other evidence that Breda cites is not to the contrary.  First, he points out that someone from human resources informed him in December 2014 that questions regarding the impact of resigning on his clinical privileges should be directed to the credentialing department.  Dkt. 15-1 at 13, 39–40; Dkt. 26-4 at 95 (J.A. 698) (notes from December 11, 2014 meeting stating that Breda was "[i]nformed the credentialing department is involved re: questions related to privileges").  He contends that this statement was an assurance that "resigning his employment would not affect his clinical privileges unless he also contacted the credentialling department."  Dkt. 15-1 at 13 (internal quotation marks omitted).  But that of course does not follow.  By

instructing Breda to ask the credentialing department about the effect of resigning on his privileges, human resources expressed no view about what that effect would be, nor did it provide any assurances to Breda.  If anything, the fact that Breda, by his own admission, never followed up with the credentialing department, despite receiving this guidance, Dkt. 15-1 at 38, 40, provides further evidence of his willful ignorance.  The Secretary reasonably dismissed these facts as unhelpful to Breda.  Dkt. 26-4 at 242–43 (J.A. 845–46).

Breda next claims that human resources agreed to help him transfer to another VA hospital, the implication being that it would not have done so if his resignation would have impacted his privileges.  Dkt. 15-1 at 39–40.  But the call with human resources that Breda references took place in November 2014, months before Breda resigned.  Dkt. 26-4 at 89–91 (J.A. 692–94).  So even if human resources had at that point agreed to help him transfer, it is unclear what that fact would have to do with whether Breda was on notice regarding the effect of resignation on his privileges.  Breda also seems to exaggerate the nature of the assistance human resources agreed to provide.  Notes from the call state only that human resources agreed to provide him the contact information of other local VA hospitals.  Dkt. 26-4 at 90 (J.A. 693).  If Breda assumed that a mere offer to pass along contact information was in fact an assurance regarding the security of his clinical privileges in the event he resigned, that was an unreasonable assumption on his part.

Finally, Breda argues that because the February 3, 2015 letter cited separately to employee handbooks pertaining to employment matters and clinical privileges, it "indicate[d] that [his] appointment and clinical privileges [we]re separate interests, controlled by different rules and departments."  Dkt. 15-1 at 14–15.  Once again, that is an unreasonable interpretation of the evidence.  The fact that the Hospital maintained separate policies and departments

governing employment and privileges does not in any way imply that an employment action cannot have consequences for privileges, and vice versa.[7]

For all of these reasons, the Court concludes that the Secretary reasonably rejected Breda's argument that he did not intend to, and therefore did not, surrender his clinical privileges. Because the Court affirms the Secretary's decision on these grounds, it need not reach the parties' alternative arguments regarding whether, even if Breda had not surrendered his privileges, an NPDB report would still be required because the Hospital revoked his clinical privileges through a "professional review action." *Compare* Dkt. 15-1 at 27–31, *with* Dkt. 17 at 34–37.

## B.

Breda's fallback position is that even if he did surrender his privileges, the Hospital was not required to file an adverse-action report because certain other statutory prerequisites were not satisfied. Specifically, under 42 U.S.C. § 11133(a)(1)(B)(i), a "health care entity" must file an NPDB report if it "accepts the surrender of clinical privileges of a physician while the physician is under an investigation by the entity relating to possible incompetence or improper professional conduct." The reporting requirement thus applies only if there is an "investigation" and if a "health care entity" conducts that investigation. Breda argues that neither condition had been fulfilled when he resigned. The Court is unconvinced.

---

[7] Breda also maintains that Rounds and MacKenzie both testified that there was no investigation of Breda, Dkt. 15-1 at 44–45 (citing Dkt. 26-4 at 37–44 (J.A. 570–76)), but, as Defendants correctly point out, Dkt. 17-1 at 26 n.9, Breda takes the statements in question somewhat out of context. Neither Rounds nor MacKenzie said or implied that there was no investigation into Breda in the sense relevant here. Dkt. 26-4 at 37–44 (J.A. 570–76).

1.

The Court begins with requirement of an "investigation."  The Act does not further define "investigation," nor do HHS regulations.  *See Doe v. Leavitt*, 552 F.3d 75, 79 (1st Cir. 2009).  But according to HHS's NPDB Guidebook, numerous versions of which were operative at different points in this case's history, the term should be construed broadly and in a common-sense, rather than technical, manner.  The 2015 version of the Guidebook, which was in effect when the Secretary first considered Breda's case, offers no firm definition of "investigation" but provides certain "[g]uidelines" regarding investigations, among them:

- For NPDB reporting purposes, the term "investigation" is not controlled by how that term may be defined in a health care entity's bylaws or policies and procedures

- The investigation must be focused on the practitioner in question

- The investigation must concern the professional competence and/or professional conduct of the practitioner in question

- A routine or general review of cases is *not* an investigation

- A routine review of a particular practitioner is *not* an investigation

2015 Guidebook, *supra*, at E–34–E–35 (emphasis in original).  The Guidebook also notes that the NPDB "interprets the word 'investigation' expansively."  *Id.* at E–34.  And it further emphasizes that although the NPDB "may look at a health care entity's bylaws and other documents for assistance in determining whether an investigation has started or is ongoing," the agency "retains the ultimate authority to determine whether an investigation exists," and "an investigation is not limited . . . to the manner in which the term 'investigation' is defined in a hospital's by-laws." *Id.*  The upshot is that "if a formal, targeted process is used when issues related to a specific practitioner's professional competence or conduct are identified, this is considered an investigation for the purposes of reporting to the NPDB."  *Id.* (emphasis omitted); *see also* U.S.

Dep't of Health & Hum. Servs., *National Practitioner Data Bank Guidebook* E-36–E-37 (Oct. 2018), https://www.npdb.hrsa.gov/resources/NPDBGuidebook.pdf ("2018 Guidebook") (similar).[8]

This guidance coheres with the ordinary meaning of "investigation:"  a "detailed examination," "searching inquiry," *Investigation*, Webster's Third New International Dictionary (1993), or "systematic examination," *Investigation*, Oxford English Dictionary (2d ed. 1989), https://www.oed.com/oed2/00120576.  This Court endorsed these definitions in *Rogers*, 139 F. Supp. 3d at 137, as did the First Circuit in *Leavitt*, 552 F.3d at 84.  *Rogers* also noted, consistent with the Guidebook, that "[n]owhere" does the Act or its implementing regulations require that "to qualify as an 'Investigation' for the purpose of the mandatory reporting requirements, the Hospital's actions must be taken in accordance with its own internal bylaws or policies." 139 F. Supp. 3d at 142.  This makes sense because the reporting requirement "is based on an 'investigation' as that term is contemplated by the statute, not as contemplated by a health care entity's individualized and internal governing documents."  *Id.*  As *Rogers* explained, an alternative rule "would result in ad hoc reporting and reporting inconsistencies across the multitude of health care entities throughout the nation."  *Id.*

The record leaves no doubt that the Secretary reasonably concluded that Breda resigned while under investigation into his possible incompetence and misconduct.  Dkt. 26-4 at 73 (J.A.

---

[8] The parties do not address whether the Guidebook should receive interpretive deference and if so what variety.  Giving the Guidebook's relatively informal nature, courts have accorded its interpretations deference under *Skidmore v. Swift*, 323 U.S. 134, 140 (1944), based on "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade," *id.*; *see, e.g.*, *Doe v. Leavitt*,  552 F.3d 75, 80 (1st Cir. 2009); *Leal v. Sec'y of U.S. Dep't of Health and Hum. Servs.*, 620 F.3d 1280, 1282–83 (11th Cir. 2010); *Doe v. Rogers*, 139 F. Supp. 3d 120, 136 (D.D.C. 2015).  The Court need not resort to deference doctrines to resolve this case, so it does not pass on the issue.

605); *id.* at 242 (J.A. 845).  Although many portions of the record bear this out, the Secretary

relied most heavily on the Jankowich Committee's memorandum.  In both his initial decision

and his denial of Breda's request for reconsideration, the Secretary quoted the memorandum's

unanimous finding that "Dr. Breda was under investigation at the time he resigned from the

medical center."  *Id.* at 5 (Initial Decision) (J.A. 524) (quoting Dkt. 26-3 at 74 (J.A. 195)); *id.* at

73 (Reconsideration Decision) (J.A. 605) (quoting Dkt. 26-3 at 74 (J.A. 195)).

 The Jankowich Committee's memorandum itself provides additional detail in support of

this conclusion.  It recounts how Curioso notified Breda regarding concerns about Breda's

"performance" and "conduct," including his "clinical competency" and "bedside behavior."  Dkt.

26-3 at 73–74.  It also describes how "meetings were held with Dr. Breda" on two occasions,

"following up on and discussing the various incidents investigated during Dr. Curioso's fact

finding."  *Id.* at 74 (J.A. 195).  And it details the MEC's review process and its determination

that Breda had demonstrated substandard performance, misconduct, and/or incompetence

meriting a revocation of his privileges.  *Id.*; *see Rogers*, 139 F. Supp. 3d at 137–38 (considering,

in assessing whether an investigation was ongoing, materials cited in the Secretary's decision

that recount how hospital personnel reviewed records pertaining to the physician in question,

held meetings, and conducted an analysis of the physician's performance).

 The Secretary looked to other evidence as well.  He cited several letters MacKenzie sent

to Breda, which, in turn, incorporate Curioso's June 10, 2014 letter that set the investigation in

motion.  Dkt. 26-4 at 4–5 (J.A. 523–24).  In this correspondence, MacKenzie repeatedly affirmed

that Breda was under investigation when he resigned.  *Id.*  Similarly, in his reconsideration

decision the Secretary quoted the VA New England Health Care System Network Director's

finding that the Hospital's inquiry into Breda "evidenced the rigor required to qualify as an investigation." *Id.* at 73 (J.A. 605) (quoting Dkt. 26-3 at 13 (J.A. 134)).

In short, the Secretary reasonably determined, with reference to substantial record evidence, that the Hospital was investigating Breda's competence and conduct at the time he resigned. The record supports the conclusion that the investigation began with Curioso's letter and initial fact finding; involved meetings and discussions between Breda, Curioso, and Rounds; and continued through the MEC's review and recommendation.[9] This was hardly a routine or informal review of Breda's performance—a point the Hospital made abundantly clear when it notified Breda that it would terminate him in light of its findings. What occurred was, in the words of the Guidebook, a "formal, targeted process" involving identified "issues related to a specific practitioner's professional competence or conduct." 2015 Guidebook, *supra*, at E-34 (emphasis omitted).

Defendants' brief cites extensively to Curioso's initial letter as further evidence that Breda was under investigation, a step that Breda emphatically resists. The letter certainly supports Defendants' position: Curioso wrote that he would be "looking into issues [related to Breda's performance and conduct] more carefully," "interviewing staff with whom [Breda] worked," and "reviewing [Breda's] medical charts from the past year." Dkt. 26-4 at 45 (J.A.

---

[9] One might plausibly argue that the investigation ended when Breda resigned and surrendered his privileges—*i.e.*, before the MEC's meeting. *See* Dkt. 26-2 at 66 (J.A. 65) (stating, in the 2001 Guidebook, that "[a]n investigation is considered ongoing until the health care entity's decision making authority takes a final action or formally closes the investigation"); 2015 Guidebook, *supra*, at E-34 ("The NPDB considers an investigation to run from the start of an inquiry until a final decision on a clinical privileges action is reached."); *Leavitt*, 552 F.3d at 86 (affirming the NPDB's position that "an 'investigation' ends only when a health care entity's decisionmaking authority either takes a final action or formally closes the investigation"). But the distinction is immaterial because, either way, the investigation was ongoing at the moment Breda resigned.

577).  These are hallmarks of an investigation.  But Breda insists that Defendants cannot rely on Curioso's letter because the Secretary did not directly cite to it in any of his decisions.  Dkt. 19 at 6, 10.  Invoking the rule of *SEC v. Chenery Corp.*, 318 U.S. 80, 95 (1943), which established that "an administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained," Breda contends that Defendants cannot now invoke a letter on which the underlying agency decisions did not expressly rely, Dkt. 19 at 6, 10–13.  In response, Defendants note that several of the documents that the Secretary cited themselves cite to or quote Curioso's letter, including in the selections the Secretary quoted.  Dkt. 22 at 12–13.  This, Defendants maintain, makes Curioso's letter fair game.  *Id.*

Just how much leeway an agency has to rely in litigation on record evidence arguably incorporated into but not directly cited in its decision is a difficult, fact-intensive question that resists a general rule.  *Compare Safe Food & Fertilizer v. EPA*, 365 F.3d 46, 48 (D.C. Cir. 2004), *and Int'l Union v. U.S. Dep't of Labor*, 358 F.3d 40, 44 (D.C. Cir. 2004), *with Chiquita Brands Intern. Inc. v. SEC*, 805 F.3d 289, 299 (D.C. Cir. 2015).  But it is not a question the Court needs to answer today.  As explained above, the Secretary's decision can be sustained with reference only to the evidence he explicitly considered.  Curioso's letter would gild the lily, but it is not essential.

Breda makes a further *Chenery*-esque argument regarding the evidence on which the Secretary concededly relied.  He explains that, according to the Guidebook, a hospital that submits an adverse-action report based on a physician's surrender of his privileges while under investigation "should have evidence of an ongoing investigation at the time of surrender" and "should be able to produce evidence that an investigation was initiated prior to the surrender of

30

clinical privileges by the practitioner."  Dkt. 19 at 5 (emphasis omitted) (quoting 2018 Guidebook, *supra*, at E-37).  From this guidance he infers a requirement that the Secretary may rely only on documentation that the Hospital created before the investigation concluded.  Dkt. 19 at 5–9.  That is to say, Breda insists that it was improper for the Secretary, in determining that Breda had resigned while under investigation, to consider documents, like the Jankowich Committee's memorandum, that were not generated mid-investigation.  Such materials, he says, represent *post hoc* rationales from the Hospital, in derogation of *Chenery*.  *Id.* at 11–13.

Breda's reading of the Guidebook is mistaken.  The Guidebook requires only that the evidence demonstrate that *the Hospital initiated an investigation* prior to Breda's resignation; it does not mandate that the Hospital produce *evidence generated* prior to Breda's resignation in support of that proposition.  So the Secretary's reliance on documents like the Jankowich Committee's memorandum is unproblematic.  Breda's position also essentially attempts to apply *Chenery* to the Hospital.  The Hospital, he says, cannot rely on "*post hoc* assertions."  *Id.* at 8.  But *Chenery* governs judicial review of agency decisions; it does not limit the evidence that a regulated party may invoke in support of its conclusion that a reportable event has occurred.  The Hospital was under no obligation to limit its submission to the Secretary to records created before or at the time that Breda surrendered his privileges.[10]

---

[10] Although *Simpkins* does say that "[t]he Guidebook requires health care entities that submit an adverse action report based on the surrender of a physician's privileges while under investigation to have *contemporaneous evidence* of an ongoing investigation," 999 F. Supp. at 115 (emphasis added), the Court does not understand *Simpkins* to have endorsed Breda's position, because, that dictum notwithstanding, *Simpkins* never actually applies the rule Breda advocates.  *Simpkins* is best understood simply to say what the Court holds today: a hospital must provide evidence of a contemporaneous investigation.

Breda's other arguments fail to move the needle.  He devotes pages of briefing to convincing the Court that there could not have been an "investigation" within the meaning of the Act, because the inquiry that occurred did not comply with the formalized investigation procedures set forth in VHA policies.  Dkt. 15-1 at 11–12, 43–44; Dkt. 19 at 6–7.  But as Judge Hogan held in *Rogers*, neither the Act nor its implementing regulations require the Hospital's investigation to have been conducted "in accordance with its own internal bylaws or policies" in order for it to "qualify as an 'Investigation' for the purposes of the mandatory reporting requirements."  139 F. Supp. 3d at 142; *see also* 2015 Guidebook, *supra*, at E-34 (explaining that the agency "retains the ultimate authority to determine whether an investigation exists" and that "an investigation is not limited to a health care entity's gathering of facts or limited to the manner in which the term 'investigation' is defined in a hospital's by-laws").  So the Secretary was not obligated to evaluate the Hospital's actions against the Hospital's own rules.[11]  Finally, Breda suggests that Curioso's letter could not have initiated an investigation, because it did not use the word "investigation."  Dkt. 19 at 6–7.  The Court, however, is aware of no "magic words" doctrine of administrative law, and it was not arbitrary or capricious for the Secretary to decline to enforce any such formalistic rule here.  *See Int'l Transmission Co. v. Fed. Energy Reg. Comm'n*, 988 F.3d 471, 485 (D.C. Cir. 2021).

To be sure, the Secretary could have been more thorough in his analysis of whether Breda was under "investigation" at the time he resigned.  Ideally, he would have described the investigation in more detail, and his conclusion is awkwardly phrased in the passive voice:  "The

---

[11] The Court expresses no view on whether the investigation did or did not comply with VHA policies, although it notes that after having reviewed the record, the Network Director of the VA New England Health Care System concluded that the Hospital had complied with its policies. Dkt. 26-3 at 13 (J.A. 134).

record shows that you are considered to have resigned while under investigation; Providence VA

makes it clear that there was an investigation in your matter."  Dkt. 26-4 at 73 (Reconsideration

Decision) (J.A. 605); *see also id.* at 5 (Initial Decision) (J.A. 524) ("The record clearly shows

that you are considered to have resigned while under investigation.").  But Breda has raised no

failure-to-explain challenge to the Secretary's decisions, and he reads those decisions, as does

the Court, to hold that "the Hospital had commenced an investigation before [his] resignation."

Dkt. 19 at 5.  The adequacy of the Secretary's reasoning is therefore not at issue.

But even if Breda had not forfeited any such argument, the Court would still uphold the

Secretary's decision.  An agency's decision "need not be a model of clarity" to survive judicial

review, *Casino Airlines, Inc. v. NTSB*, 439 F.3d 715, 717 (D.C. Cir. 2006), and courts may

affirm an agency explanation that is "articulated only briefly and in a somewhat conclusory

fashion" initially and then "elaborate[ed]" in litigation, *Chiquita Brands Intern. Inc.*, 805 F.3d at

299; *see also Chritton v. NTSB*, 888 F.2d 854, 862 (D.C. Cir. 1989).  The Secretary's decisions

here clear that bar.  He cited to and discussed the relevant documents, and, based on his review

of the record, he found that the Hospital had correctly determined that it had been investigating

Breda when Breda resigned.  Dkt. 26-4 at 73 (Reconsideration Decision) (J.A. 605); *id.* at 5

(Initial Decision) (J.A. 524); Dkt. 26-4 at 242 (Final Decision on Remand) (J.A. 845).  He

therefore established "a 'rational connection between the facts found and the choice[s] made.'"

*State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168

(1962)).  Moreover, the record evidence is overwhelming with respect to whether Breda was

under investigation for possible incompetence or improper professional conduct at the time he

resigned.  Indeed, it is difficult to imagine how the Secretary could possibly have reached a

contrary decision in a reasoned manner.  So it is safe to conclude that any lack of precision or

detail in the Secretary's decisions "did not affect the outcome" and did not "prejudice" Breda in

any way. *See Jicarilla Apache Nation v. U.S. Dept. of Interior*, 613 F.3d 1112, 1121 (D.C. Cir.

2010) (internal citation and quotation marks omitted); *see also* 5 U.S.C. § 706 (providing that

courts engaged in arbitrary and capricious review of agency action must take "due account . . . of

the rule of prejudicial error").

Finally, although the Secretary's use of the passive voice at times makes his decision

vaguer than it might have been about where the Hospital's determination ends and his begins,

elsewhere he declares without qualification or ambiguity that "[t]he record shows that [Breda]

resigned while under investigation relating to professional competence and conduct." Dkt. 26-4

at 6 (J.A. 525); *see also id.* (reiterating that "the record shows [that Breda] resigned while under

investigation"); *id.* at 242 (J.A. 845) ("[T]he new information and clarifications provided by [the

Hospital] supports the conclusion that your clinical privileges, as well as your employment, were

resigned during the course of an investigation."). And in any event, the line between a finding

that Breda was, in fact, under investigation, and a finding that the Hospital—that is, the

investigator—has made clear "that there was an investigation" of Breda is so fine as to be

without practical consequence here.

2.

Much of the preceding analysis applies equally to Breda's argument that, even if he was

"investigat[ed]," it was not by a "health care entity." Dkt. 15-1 at 40–43; 42 U.S.C.

§ 11133(a)(1)(B)(i). The Act defines "health care entity" to mean, among other things, a

licensed hospital. 42 U.S.C. § 11151(4)(A)(i). Thus "an investigation by individual supervisors

of a physician's quality of care does not trigger" the Act's reporting requirements "unless the

actions of those supervisors amount to action by the hospital." *Simpkins*, 999 F. Supp. at 114;

34

*see also Am. Dental Ass'n v. Shalala*, 3 F.3d 445, 447 (D.C. Cir. 1993) ("Congress did not intend the term 'entity' to encompass individual practitioners."). Breda's contention is that the *Hospital* did not investigate him; rather, *Curioso* did so in his capacity as Breda's individual supervisor.

The Secretary reasonably rejected this argument. As the Court has just recounted, Curioso did not alone conduct the investigation into Breda's performance. Breda met twice with Curioso and Rounds as part of the inquiry. Dkt. 26-3 at 74 (J.A. 195). Indeed, Rounds was the person who initially recommended to MacKenzie—the Hospital Director—that Breda be terminated, so the Court is hard-pressed to say that she did not participate in the investigation. *Id.* That the investigation led to MacKenzie notifying Breda that he would be terminated is yet more evidence that what occurred was not an ad hoc review conducted solely at Curioso's discretion and under his authority. If anyone could have acted with the Hospital's imprimatur, it was MacKenzie. And, although Breda resigned (and surrendered his clinical privileges) before the MEC met, the fact that, not knowing that he had done so, the MEC convened to render a recommendation that his privileges be revoked further demonstrates that the investigation was an entity-wide affair. *Cf. Leavitt*, 552 F.3d at 86 (affirming the Secretary's position that "an 'investigation' ends only when a health care entity's decisionmaking authority either takes a final action or formally closes the investigation").

Ample record evidence supports the Secretary's conclusion on this score. The key sources are those that the Court has already discussed, in particular: (1) the Jankowich Committee's memorandum, which describes the investigation in some detail, making clear that it involved numerous Hospital personnel, meetings, and MEC review, and (2) the decision from the Network Director of the VA New England Health Care System reviewing the Hospital's actions. Dkt. 26-4 at 73–74 (J.A. 605–06) (citing Dkt. 26-3 at 71–75 (J.A. 192–96) and Dkt. 26-3 at 13

(J.A. 134)).  As the Court has recounted, the Secretary concluded, based on this evidence, that "[t]he record shows that [Breda was] considered to have resigned while under investigation; [the Hospital] makes it clear that there was an investigation in [Breda's] matter."  Dkt. 26-4 at 73 (J.A. 605).[12]  Among other things, the Secretary quotes the decision from the Network Director, which refers to the "rigor[ous]" "Fact Finding conducted by" the Hospital—and not by Curioso acting alone.  *Id.*  Although, again, the Secretary perhaps formulated this analysis with less-than-perfect clarity, the Court can "reasonably . . . discern[]" the path of the Secretary's reasoning. *Bowman Transp., Inc.*, 419 U.S. at 285–86.

In sum, the Secretary reasonably (and, it would seem, inescapably) concluded that "Providence VA"—that is, the Hospital—conducted an investigation regarding Breda's possible incompetence or improper professional conduct.  That is exactly how Breda understands the Secretary's decision, too.  He summarizes it in his briefing as follows: "The Secretary determined that an investigation by a health care entity, within the meaning of the Act, had begun on June 10, 2014 with the Supervisor's Letter . . . and had not closed when Dr. Breda resigned."  Dkt. 15-1 at 20; *see also* Dkt. 19 at 5 ("[T]he agency determined *the Hospital* had commenced an investigation before Dr. Breda's resignation." (emphasis added)).

In response, Breda turns again to *Simpkins* for support, arguing that it closely maps on to this case.  Dkt. 15-1 at 42–44.  *Simpkins* held that only individual supervisors, not the health care entity, had been investigating the plaintiff-physician in that case when he resigned, and it vacated

---

[12] The Court considers only the Secretary's reconsideration decision on this issue, because, although Breda raised the issue in a letter to the NPDB sent in connection with his initial dispute of the adverse-action report, Dkt. 26-2 at 10 (J.A. 9), he did not do so—or at least did not do so clearly—in his actual request for dispute resolution, Dkt. 26-2 at 6 (J.A. 5).  As a result, the Secretary did not treat the issue as joined or squarely consider it until the reconsideration stage. Dkt. 26-4 at 10 (J.A. 542); *id.* at 71 (J.A. 603).  In any event, the Court would reach the same conclusion if it considered both decision letters instead of just the one.

the Secretary's contrary order.  999 F. Supp. at 113, 116.  The court gave two reasons for this

conclusion.  First, the evidence did not indicate that an entity-level investigation took place: the

inquiry at issue had been initiated with the agreement of the physician in question, and the doctor

who led it testified that the review "was no greater than any normal review of a physician's care"

and in this testimony "gave the impression that the[] recommendations" the review generated

"were primarily for [the] plaintiff's benefit and increased comfort."  999 F. Supp. at 115.

Second, *Simpkins* looked to a section of the then-operative NPDB Guidebook addressing what

"constitute[d] a reportable action under the provisions governing professional review actions."

*Id.*  The Guidebook said that a hospital's "bylaws, rules[,] and regulations" were an important

indicator of whether a "professional review action" had occurred.  *Id.*[13]  Although the court

recognized that this guidance was not directed at determining whether the hospital had conducted

an investigation, it nevertheless treated the guidance as a persuasive indication that it should rely

on the hospital's bylaws to determine whether the hospital had investigated the plaintiff.  *Id.*

And, because the hospital had not followed its bylaws, the court held that there had been no

entity-level investigation.  *Id.* at 115–16.

On this issue, *Simpkins* is alternatively distinguishable and unpersuasive.  A basic

difficulty with *Simpkins* is that it conflates the question of whether an "investigation" was

conducted with the question of whether the "entity," rather than an individual practitioner,

conducted any investigation that occurred.  That is understandable, because the same

considerations and evidence will typically bear on both questions.  But it makes *Simpkins*

challenging to apply here, where Breda raises distinct arguments with respect to the two issues.

---

[13] Although *Simpkins* quotes the Guidebook, it does not indicate which edition of the Guidebook it is referencing.

In any event, the Hospital's actions here were quite different than those described in *Simpkins*. Curioso began the investigation of Breda without Breda's consent, *see* Dkt. 26-4 at 45 (J.A. 577), unlike the supervising physician in *Simpkins*, 999 F. Supp. at 115. And the investigation of Breda was plainly not "any normal review" conducted "primarily for [Breda's] benefit and increased comfort," as it culminated in Breda's proposed termination and a MEC recommendation to revoke his privileges. *Id.* So, contrary to what Breda maintains, the facts that *Simpkins* found most probative cut the opposite way here.

The Court also disagrees with *Simpkins*' use of the Guidebook and application of the hospital's bylaws. For one thing, from the Court's review, neither the version of the Guidebook in place at the time the Secretary first considered Breda's dispute nor the subsequent version operative when he issued his most recent decision features the specific language on which *Simpkins* relied. And even if that was not the case, the Court would not rely on that language. As *Simpkins* acknowledged, the provision in question concerns the distinct issue of what constitutes a "professional review action[]." 999 F. Supp. at 116. That provision has little or no bearing on the question presented here. Nor does the Guidebook flesh out the key indicia of an "entity" versus an "individual" investigation. Moreover, if any Guidebook provisions are probative on this question, they are those that help define "investigation," given how intertwined the "entity" and "investigation" issues are. As explained above, those provisions could hardly be clearer that hospital bylaws are not determinative. 2015 Guidebook, *supra*, at E-34. The Court therefore assigns little weight to *Simpkins* in this context.

## CONCLUSION

For these reasons, the Court will **DENY** Breda's motion for summary judgment, Dkt. 15, and **GRANT** Defendants' cross-motion for summary judgment, Dkt. 17.

A separate order will issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  March 29, 2023